AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
## for the
### District of New Mexico

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

2022 JAN 14   AM 11: 05

CLERK - LAS CRUCES

In the Matter of the Search of  )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No. 22MR66
                                              )
A Red and Grey Memory/SD Card and Two SIM Cards )
                                              )
                                              )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is attached and fullly incorporated herein.

located in the _____ District of _____ New Mexico _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is attached and fullly incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
  ☑ evidence of a crime;
  ☐ contraband, fruits of crime, or other items illegally possessed;
  ☐ property designed for use, intended for use, or used in committing a crime;
  ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(g)(1) | Previously convicted felon in possession of a firearms and ammunition |
| 21 USC 841 | Possession with intent to distribute a controlled substance |
| 18 USC 924(c) | Possessing a firearm in furtherance of a drug trafficking crime |

The application is based on these facts:
See Attachment C which is hereby attached and incorporated by reference into this warrant.

  ☑ Continued on the attached sheet.
  ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

B. Sterling Nixon ATF Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by electronically submitted and telephonically sworn  *(specify reliable electronic means)*.

Date: 1/14/2022

_____
Judge's signature

City and state: Las Cruces, New Mexico    Gregory B. Wormuth, United States Magistrate Judge
                                         Printed name and title

## ATTACHMENT A

The items to be searched are a Memory/SD card and two SIM Cards seized from Caesar Nathanial James Crayton on August 16, 2020, at the time of his arrest and are more fully described as follows:

   a. One (1) San Disk Ultra, 32 GB memory card.
   b. One (1) Cricket SIM CARD.
   c. One (1) white in color SIM CARD.

## ATTACHMENT B

### ITEMS TO BE SEARCHED AND SEIZED

The items described in Attachment A may be searched, and any of the following items found in electronic or any other form that constitute evidence of Caesar Nathanial James Crayton (Crayton" committing the crimes of unlawful possession of a firearm, in or affecting interstate commerce, by a person who has been previously convicted of a felony, in violation of 18 United States Code § 922(g)(1), possession with the intent to distribute a controlled substance, in violation of 21 United States Code § 841, and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 United States Code § 924(c).

1. Any records of any/all incoming and outgoing calls or voicemail messages to or from Crayton and his associates. Any records of text messages both to and from Crayton and his associates.

2. Any records of photographic and/or video imaging stored on the Memory/SD card and SIM Cards related to the criminal activities described above and perpetrated by Crayton and his associates.

3. Any records of any audio recordings made related to the listed criminal activities perpetrated by Crayton and his associates.

4. Any records of "contacts" stored in the Memory/SD card and SIM Cards for Crayton and his associates, including names, addresses, telephone numbers, email addresses, and other contact information.

5. Any records of electronically formatted personal notes both to and from Crayton and his associates who were involved in the criminal activities perpetrated by him.

6. Any evidence of user attribution of the Memory/SD card and SIM Cards.

Any of the items described in subparagraphs 1 through 7 above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer

with the aid of computer-related equipment. The search procedure of the electronic data contained in computer operating software or memory devices may include the following techniques:

1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3. "scanning" storage areas to discover and possibly recover recently deleted files;

4. "scanning" storage areas for deliberately hidden files; or

5. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

In the case of voicemail messages, such messages may be retrieved by engaging the voicemail function of the Memory/SD card and SIM Cards either through a prompt on the phone or a dedicated button.

## AFFIDAVIT OF B. STERLING NIXON

I, B. Sterling Nixon, Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, being duly sworn, do declare and state:

### I. INTRODUCTION

1. I respectfully submit this Affidavit pursuant to Rule 41 of the Federal Rules of Criminal Procedure in support of a search warrant to search the **MEMORY/SD CARD AND SIM CARDS** seized from Ceasar Nathanial James Crayton, at the time of his arrest. The **MEMORY/SD CARD AND SIM CARDS** are more fully described in Attachment A and are more fully described in below:
   a. One (1) San Disk Ultra, 32 GB memory card.
   b. One (1) Cricket SIM CARD.
   c. One (1) white in color SIM CARD.

2. The **MEMORY/SD CARD AND SIM CARDS** are currently in law enforcement possession and stored at the ATF office in Las Cruces, NM.

3. For the reasons stated below, I submit that there is probable cause to believe that the **MEMORY/SD CARD AND SIM CARDS** presently contain or constitutes evidence of the following nature: Title 18 United States Code § 922(g)(1), which makes it a crime for any person who has been convicted of a felony crime punishable by imprisonment for a term exceeding one year, to possess a firearm or ammunition in or affecting interstate commerce; 21 USC § 841, which makes it a crime to possess a controlled substance with the intent to distribute it; and 18 USC § 924(c), which makes it a crime for anyone to possess a firearm in furtherance of a drug trafficking crime.

1

## II. AFFIANT'S BACKGROUND AND EXPERIENCE

3. I am a Special Agent (SA) with the United States Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have so been employed since May 17, 2015. I am presently assigned to the ATF Las Cruces Field Office in Las Cruces, NM. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7), and I am empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia. Prior to May 17, 2015, I worked for approximately four and a half years as an Agent with the United States Border Patrol.

4. As an ATF Special Agent, I have participated in investigations of illicit firearms and narcotics trafficking organizations. During these investigations, I have participated in various types of investigative techniques, including electronic surveillance; undercover agents and informants; and controlled purchases of firearms and narcotics from suspects. I have participated in physical surveillance operations and have participated in the execution of state and federal arrest warrants and search warrants.

5. As an ATF Special Agent, I have conducted and participated in both state and federal investigations involving the trafficking of firearms and distribution of controlled substances. I have investigated and assisted in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking. I have been involved in various types of electronic surveillance, and in debriefing defendants, witnesses and informants as well as others who have knowledge of gang-related distribution of firearms and narcotics.

6. As a result of my training and experience, I have gained knowledge in the utility of undercover agents, confidential informants, physical surveillance, electronic surveillance, oral surveillance, consensual recording, investigative interviews, mail covers, garbage searches, GPS tracking devices, the service of Grand Jury subpoenas, courtroom testimony, and the execution of federal and state search and arrest warrants.

7. In addition to utilizing the aforementioned investigative techniques, I have been required during these investigations to analyze information resulting from traditional record searches, pen registers and trap and trace devices, financial records, utility records, and telephone toll and subscriber records.

8. By virtue of my training and experience, and through consultation with other Special Agents and officers who have conducted firearm and narcotics investigations, I have become familiar with the methods used by firearms and narcotics traffickers to import, transport, safeguard, and distribute firearms and narcotics.

9. Where statements made by other individuals (including other Special Agents and law enforcement officers) and information contained in reports and other documents or records are referenced in this Affidavit, such statements are described in sum and substance and in relevant part only.

10. Because this Affidavit is submitted for the limited purpose of obtaining a search warrant for the **MEMORY/SD CARD AND SIM CARDS**, I have not included each and every fact known to me relating to the underlying investigation. Rather, I have set forth only the facts that I believe are necessary to support probable cause for the search warrant sought herein.

### III. CASE BACKGROUND

11. On August 16, 2020, a Border Patrol Agent (BPA) was conducting primary immigration inspections at the U.S. Border Patrol Checkpoint on Interstate 10, mile marker 120.5 west of Las Cruces, NM. At approximately 3:00 AM, a blue 2019 Nissan Altima (VIN: 1N4BL4BV6KC242492), bearing Colorado license plate JBQ 887, approached the U.S. Border Patrol Checkpoint.

12. The vehicle was being driven by Ceasar Nathanial James CRAYTON, who was the sole occupant of the vehicle. A BPA asked CRAYTON if he was a U.S. Citizen, and CRAYTON responded that he was. The BPA noticed that CRAYTON was driving a vehicle with a Colorado license plate. The BPA Agent asked CRAYTON where he was going, since travelers

that are heading to Colorado sometimes forget to head north on I-25 and accidentally continue westbound on I-10. CRAYTON stated that he was going from Oklahoma to California due to a family emergency. CRAYTON stated that his father had become ill as a result of a colonoscopy. The BPA asked CRAYTON if the vehicle was his. CRAYTON responded that the vehicle was a rental. During the interaction with CRAYTON, the BPA noticed the odor of marijuana coming from the vehicle. CRAYTON also appeared to become increasingly more nervous. The BPA asked CRAYTON for consent to perform a canine inspection of the vehicle, to which CRAYTON consented. CRAYTON was then escorted into the secondary inspection area and exited the vehicle.

13. Once in the secondary area, the BPA again asked CRAYTON for consent to perform a canine inspection and was given consent. The BPA deployed his government assigned Canine, JO 150124, and performed a systematic inspection of the vehicle, which yielded an alert. The BPA informed CRAYTON of the alert and informed CRAYTON that he was going to conduct a hand search of the vehicle. CRAYTON was escorted into the BP Checkpoint Station and entered into IDENT/IAFIS by a BPA.

14. A subsequent search of the vehicle revealed the following (Note: not all items found are listed):
    a. Approximately 48 grams of methamphetamine.
    b. Approximately, 35 grams of a green leafy substance, which had traits and characteristics consistent with marijuana
    c. In a black bag that was located behind the driver's seat a Glock, Model 30 (Gen 4), .45 caliber, semi-automatic pistol, bearing serial number BNCG661, was located.
    d. Approximately, 222 rounds of nine millimeter, 120 rounds of .40 caliber, and 195 rounds of .45 caliber ammunition.
    e. One 25 round magazine, one 13 round magazine, and one 17 round magazine.
    f. Twelve phones were found in the vehicle, to include four phones that CRAYTON had around him in the car.

15. Once CRAYTON was escorted to the Border Patrol Check Point Station, a Terry Frisk was conducted on CRAYTON. A BPA discovered several unnatural bulges in and around

CRAYTON's person. CRAYTON informed the BPA that it was money. The money was wrapped in small bundles and, according to BPAs present, totaled approximately $6,853 dollars and one $10.00 note of Peruvian Sole.

16. CRAYTON was told that he was not under arrest, but only was being detained pending an ongoing investigation.

17. A BPA made contact with Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent (SA) Sterling Nixon with regards to the aforementioned incident. SA Nixon responded to the scene.

18. SA Nixon and BPA John K. Sammons proceeded to interview CRAYTON. The subsequent conversation was recorded. SA Nixon advised CRAYTON of his Miranda Rights, as witnessed by BPA Sammons. CRAYTON agreed to speak with the Agents and signed the Waiver of rights (ATF Form 3200.4).

19. SA Nixon questioned CRAYTON regarding a myriad of topics. CRAYTON stated that his DNA would be found on the black bag (found behind the driver seat) and on the firearm that was located inside the black bag. CRAYTON stated that although he had handled the firearm in the past, he did not know the firearm was in the black bag. CRAYTON stated that the bag belonged to his brother and that his brother had left the bag in the car a few days prior. CRAYTON stated that he had rented the vehicle. CRAYTON did admit that the potato chip can (that was located inside the black bag) belonged to him as well as the marijuana found inside (approximately 21.1 grams). Initially, CRAYTON stated he had no knowledge of any illicit narcotics in the vehicle, but eventually CRAYTON stated that a portion of the methamphetamine found also belonged to him. CRAYTON stated that he had used methamphetamine the previous day. CRAYTON stated that he habitually uses both marijuana and methamphetamine. CRAYTON stated that he uses methamphetamine approximately 3 times a week and he has for the past several months.

20. CRAYTON also stated that he had recently purchased the ammunition found in the vehicle and that he planned on reselling the ammunition to a few other individuals. CRAYTON stated that he had receipts in the vehicle for the purchase of the ammunition. CRAYTON stated that he was going to make a little money from the transaction.

21. CRAYTON stated that he had received the money found on his person from unemployment. SA Nixon asked CRAYTON regarding past employment to which he was receiving the unemployment check. CRAYTON did not clearly provide the information regarding a previous employer. At one point he stated that he worked for Habitat for Humanity, but it was in an unpaid position. CRAYTON also mentioned he worked for a car wash at some point but did not provide additional details. According to SA Nixon's training and experience, individuals in possession of several thousands of dollars in cash, and who cannot explain a legitimate means by which they obtained that money, often obtained this money through illegitimate means. In order to circumvent Federal laws and regulations surrounding cash deposits in banks, individuals involved in criminal activity often deal in larger quantities of cash to prevent a "paper trail" or reporting requirements. SA Nixon also noted that CRAYTON stated that he was traveling to California, which is a known as a supply state of illicit narcotics because of its close proximity to the country of Mexico. The close proximity to Mexico, as well as the well-established illicit narcotic trafficking organizations, have enabled the lower prices of illicit narcotics, specifically methamphetamine. CRAYTON stated that he was traveling from Oklahoma, which is known as a "demand state," or a state where illicit narcotics prices are generally higher owing to the high demand and lower availability of illicit narcotics.

22. SA Nixon asked CRAYTON about the multiple phones found in the cab of the vehicle. CRAYTON stated that he uses each phone for a different function, such as one as a GPS, another to play his music, and another to talk on.

23. According SA Nixon's training and experience, multiple phones are often used by illicit narcotic dealers in order to compartmentalize their illegal activity. The use of multiple phones by individuals involved in dealing illicit narcotics is extremely common. Additionally, based on SA Nixon's training and experience, the amount of apparent methamphetamine seized in

this case (53 grams), along with the amount of cash and phones seized, are indicative of an intent to distribute said methamphetamine. SA Nixon (Affiant) also knows that individuals that distribute methamphetamine often carry firearms in order to protect themselves and their narcotics supply while they are in the process of distributing said narcotics.

24. On August 16, 2020, SA Nixon reviewed CRAYTON'S criminal history and found multiple felony convictions. SA Nixon, utilizing a comprehensive database, was able to discover that on or about December 5, 2007, CRAYTON was arrested for and later charged with 18 USC § 472, Uttering Counterfeit Currency. CRAYTON was sentenced to one year and a day of imprisonment. CRAYTON also had been arrested for other charges, including Robbery 1st Degree Business—Felony (of which CRAYTON was found guilty), Fugitive Intent to Give False Info, and Possession of a Controlled Substance. Based on this information, it appears that CRAYTON is prohibited from possessing firearms under 18 USC 922(g)(1). Additionally, it appears that CRAYTON, according to law enforcement fingerprint identification systems, has used and/or been arrested while using the name Craig James JONES.

25. On January 11, 2022, as ATF Agents was looking through evidence items in preparation for upcoming trial, it was discovered that there were a SD card and two SIM CARDS found in an Olive Green Bag, ATF Evidence Item Number 18, that were not previously included in a Search Warrant.

## IV. **PROBABLE CAUSE**

26. Based upon my training and experience, I know that persons involved in the unlawful possession of firearms by a prohibited person, and dealing in illicit narcotics, often employ the use of communication devices such as cellphones. I know that persons who are involved in the unlawful possession of firearms and who are involved in the sale of illicit narcotics, as described above, will often use cellphones to contact their customers and/or suppliers of firearms or illicit narcotics and have their records of telephone calls, text messages, SMS messages, and voicemails stored with the electronic communications storage for the cellular telephone service provider. I know that cellular telephones to include associated SD and SIM

7

Cards, are often programmed for speed dialing, contain contact lists, and recent call activity. Additionally, I know that persons involved in the unlawful possession of firearms will often keep records, notes, communications, photographs, and/or videos related to their unlawful narcotics and firearms activities stored within cellphones.

## V. CONCLUSION

27. For the foregoing reasons, I respectfully submit that there is probable cause to believe that the **MEMORY/SD CARD AND SIM CARDS** presently contain evidence of the following nature: Title 18 United States Code § 922(g)(1), Title 18 United States Code § 922(g)(1), which makes it a crime for any person who has been convicted of a felony crime punishable by imprisonment for a term exceeding one year, to possess a firearm or ammunition in or affecting interstate commerce; 21 USC § 841, which makes it a crime to possess a controlled substance with the intent to distribute it; and 18 USC § 924(c), which makes it a crime for anyone to possess a firearm in furtherance of a drug trafficking crime.

I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge, information, and belief.

B. Sterling Nixon, Special Agent
Bureau of Alcohol, Tobacco, Firearms and Explosives

**Subscribed and sworn to before**

me this 14th day of January, 2022

GREGORY B. WORMUTH
U.S. MAGISTRATE JUDGE

8